## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF A RESIDENCE LOCATED AT 7219 DEAVERS RUN COURT, SPRINGFIELD, VA 22152 | Case No. 1:25-sw-953 <br><br> **UNDER SEAL** |

## AFFIDAVIT IN SUPPORT OF APPLICATION
## FOR A RESIDENTIAL SEARCH WARRANT

I, Special Agent Aaron Bode, being duly sworn, hereby depose and state:

## I.    INTRODUCTION

### A.    Purpose of Affidavit

1.      This Affidavit is submitted in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the search of the residential property located at 7219 Deavers Run Court Springfield, VA 22152 (the "**SUBJECT PREMISES**"), which is located within the Eastern District of Virginia.

2.      I submit that the facts alleged herein provide probable cause to believe that a search of the **SUBJECT PREMISES** will yield evidence, fruits, and/or instrumentalities of violations of Title 50, United States Code, Section 4819(a)(2)(D) (conspiracy to violate the Export Control Reform Act), Title 18, United States Code Sections 554 (smuggling goods from the United States) and 1343 (wire fraud). Your Affiant therefore requests authority to search the **SUBJECT PREMISES** described in Attachment A for the items described in Attachment B.

1

B.    **Affiant Training and Experience**

3.    I am a Special Agent with Homeland Security Investigations (HSI) assigned to the HSI office in Charlotte, NC.  I have been a Special Agent with HSI since May 2010.  Prior to that, for five years, I held the position of Special Agent with the United States Naval Criminal Investigative Service ("NCIS").  I am a law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), and am authorized by law to conduct investigations and make arrests for felony offenses.

4.    My current responsibilities include investigating the illegal export, smuggling, diversion, and proliferation of controlled commodities, technology, and services from the United States.  These include commodities, technology, and services regulated by the Department of State (DOS) and the Department of Commerce (DOC).  As part of my duties, I am also responsible for investigating the illegal export, smuggling, diversion, and proliferation of controlled and uncontrolled commodities, technology, and services to or for the benefit of countries or specially designated nationals (SDNs) sanctioned by the Department of Treasury, Office of Foreign Assets Control (OFAC).  During my tenure as a Special Agent, I have conducted and participated in numerous investigations of criminal activity, including the investigation of export violations committed by both U.S. persons and foreign nationals.  I have conducted interviews related to complex investigations of illegal export activity to include the illicit activity of foreign proliferation networks.  I have executed and participated in the execution of search warrants and seized evidence pursuant to investigations involving such crimes.  I have and continue to receive on-going periodic training regarding changes to export control laws as well as techniques for evidence collection to include data contained on computers and personal electronic devices.

### C. Sources of Information

5.      The facts and information contained in this affidavit are based on my training and experience, personal knowledge, and observations during this investigation, as well as information provided by other agents involved in this investigation, which I believe to be reliable. All observations that were not made personally by me were related to me by the persons who made the observations. This affidavit contains only that information necessary to establish probable cause in support of an application for the requested search warrant. This affidavit is not intended to include each and every fact and matter observed by or made known to agents of the government.

### D. Applicable Laws and Regulations

6.      This investigation concerns alleged violations of 13 U.S.C. § 305(a)(1), Submission of False Information; 18 U.S.C. § 371, Conspiracy to Commit Offense or Defraud the United States; 18 U.S.C. § 554, Smuggling Goods from the United States; 18 U.S.C. § 1343, Wire Fraud; 50 U.S.C. §§ 4801 – 4826, the Export Control Reform Act ("ECRA"); and 15 C.F.R. §§ 730 – 774, the Export Administration Regulations (the "EAR"). The relevant laws and regulations for the purposes of this search warrant are explained in turn.

**18 U.S.C. §554 – Smuggling Goods from the United States**

8.      Section 554 of Title 18 pertains to the smuggling or attempted smuggling of goods from the United States.  It states in relevant part:

> Whoever fraudulently or knowingly exports or sends from the United States, or attempts to export or send from the United States, any merchandise, article, or object contrary to any law or regulation of the United States…shall be fined under this title, imprisoned not more than 10 years, or both.

Generally, exporters, shippers, and freight forwarders are required by U.S. law to file certain forms and declarations concerning exports of goods and technology from the United States.  Typically,

3

those filings are completed through the submission of a paper Shipper's Export Declaration ("SED") or the submission of Electronic Export Information ("EEI") via the Automated Export System ("AES"). AES is administered by the DHS, Bureau of Customs and Border Protection. SEDs and EEIs are official documents submitted to the DHS in connection with export shipments from the United States. When the value of the merchandise being sent exceeds $2,500, exporters (identified as U.S. Principal Parties In Interest ("USPPI")) must file an SED or EEI when shipping merchandise to foreign countries.[1] In addition, 15 C.F.R. § 30.10 requires all parties to an export transaction to retain documents pertaining to the export shipment for five years from the date of the export.

9.      Even if an SED or EEI is not required, if one is filed then all information within it must be truthful. Specifically, 13 U.S.C. § 305 sets forth prohibited export information activities. It states in relevant part:

> Any person who knowingly fails to file or knowingly submits false or misleading export information through the Shippers Export Declaration (SED)…or the Automated Export System (AES) shall be subject to a fine not to exceed $10,000 per violation or imprisonment for not more than 5 years, or both.

Accordingly, any exporter who fails to file an SED pertaining to an export when required or files an SED containing false information, and does so knowingly, violates this section.

10.      Thus, a violation of 13 U.S.C § 305 may serve as a predicate for a violation of the smuggling statute, 18 U.S.C. § 554. Consequently, even goods legitimately obtained, sold and delivered overseas, can be "smuggled" for purposes of this section if laws and regulations governing exports, like Section 305, are violated.

---

[1] Part 30 of Title 15, C.F.R.

4

**50 U.S.C. §§ 4801 – 4852 & 15 C.F.R. Parts 730 – 774 – ECRA & the EAR**

11.     As part of the National Defense Authorization Act of 2019, Congress enacted certain export controls, collectively known as the ECRA. Under that law, the Secretary of Commerce is granted the authority to establish ECRA's applicable regulatory framework.[2] Pursuant to that authority, the DOC reviews and controls the export of certain items, including goods, software, and technologies, from the United States to foreign countries through the EAR. Amongst other items, the EAR restricts the export of items that could contribute to the military potential of other nations or that could be detrimental to United States foreign policy or national security. Importantly, the EAR imposes licensing and other requirements for certain items to be lawfully exported from the United States or lawfully re-exported from one foreign destination to another.  The most sensitive items subject to EAR controls are identified on the Commerce Control List ("CCL").[3] Items on the CCL are categorized by an Export Control Classification Number ("ECCN"), based on their technical characteristics. Items that are not assigned an ECCN are designated as EAR99, which is a broad, catchall category.

12.     The EAR provides that when EEI information is filed, the filer is certifying that the EEI information is true, accurate, and complete.[4]  Knowingly providing false or misleading information, or causing such information to be provided, in connection with the preparation and submission of "export control documents," including EEI filings, is a violation of the EAR.[5]

13.     The EAR further prohibits certain exports, re-exports, and other conduct without a

---

[2] 50 U.S.C. § 4812.
[3] 15 C.F.R. Part 774, Supp. No. 1.
[4] 15 C.F.R. § 758.1(f).
[5] 15 C.F.R. § 764.2(g)(1)(ii). Title 15 C.F.R. § 772.1 of the EAR provides a definition of an "export control document" which includes, inter alia, "EEI on the Automated Export System (AES) presented in connection with shipments to any country."

DOC-issued license or an existing exception to the licensing requirement.[6]  15 C.F.R. § 736.2(b)(1) prohibits the export of controlled items to listed countries without an export license granted by DOC.

14.     Furthermore, 15 C.F.R. § 736.2(b)(10) prohibits any person, business, organization, or entity from proceeding with transactions with knowledge that a violation has occurred or is about to occur.  Specifically, this section states that no one may:

> sell, transfer, export, reexport, finance, order, buy, remove, conceal, store, use or loan, dispose of, transport, forward, or otherwise service, in whole or in part, any item subject to the EAR and exported or to be exported with knowledge that a violation of the Export Administration Regulations...has occurred, is about to occur, or is intended to occur in connection with the item.

15.     ECRA criminalizes violations or attempted violations of the EAR. Moreover, 50 U.S.C. § 4819(a)(2)(D) specifically prohibits any person from "conspir[ing] or act[ing] in concert with one or more other persons in any manner or for any purpose to bring about or to do any act that constitutes a violation of [ECRA], the Export Administration Regulations, or any order, license or authorization issued thereunder."

**18 U.S.C. §1343 – Wire Fraud**

16.     It is a violation of 18 U.S.C. § 1343 to use interstate wire communications in furtherance of a scheme to defraud or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises.  This includes the use of e-mail in connection with providing false or misleading statements in furtherance of violations of U.S. export control laws.

---

[6] 15 C.F.R. § 736.2.

## II.    PROBABLE CAUSE

17.    The United States Government ("USG"), including the Department of Homeland Security, Homeland Security Investigations ("HSI") and the Department of Commerce ("DOC") Bureau of Industry and Security ("BIS"), Office of Export Enforcement ("OEE"), is investigating a matter involving the unlawful export of export-controlled technology from the United States to unauthorized recipients abroad.

18.    During the course of this investigation, which has involved a cooperating company, HSI certified undercover agents (UCA), and an HSI Special Agent acting in an undercover capacity, the USG developed information that AIR WAVE ELECTRONICS INC. ("AWE"), and its President, KOK KEONG ANG ("SUBJECT"), were attempting to illegally export and divert export-controlled U.S.-origin micro-electronics, without the requisite export license, to parties in Hong Kong and China.

### A.    **AWE**

19.    AWE is an electronic component supplier.  AWE does not have a website but is listed on open-source commercial business reporting websites and in open-source database queries as located at 7219 Deavers Run Court Springfield, VA 22152, the **SUBJECT PREMISES**.  These same open-source websites and databases report SUBJECT as AWE's owner and president.  Law enforcement and Customs database queries for SUBJECT revealed he is a Malaysian National and a U.S. Lawful Permanent Resident. Open-source research of the **SUBJECT PREMISES** revealed it to be a residential dwelling.  Furthermore, open-source and law enforcement database queries have identified the **SUBJECT PREMISES** as SUBJECT's residence.

20.    Surveillance of the **SUBJECT PREMISES** conducted by DOC-BIS-OEE Special Agent Ari Kozlow on August 19, 2025, confirmed the **SUBJECT PREMISES** to be a residential

dwelling. During that surveillance, Special Agent Kozlow reported seeing two vehicles in the driveway of the **SUBJECT PREMISES**. One was identified as a Genesis bearing Virginia license plate number TZY6943 and the other was identified as a Honda SUV bearing Virginia license plate number XTZ8888. Vehicle registration checks for each vehicle revealed the former as registered to AWE at the **SUBJECT PREMISES** while the latter was registered to SUBJECT at the **SUBJECT PREMISES**. On October 11, 2025, I surveilled and photographed the **SUBJECT PREMISES** and confirmed the presence of the two aforementioned vehicles parked in the driveway of the **SUBJECT PREMISES**.

21.     I have reviewed U.S. export filings including EEI filings and bills of lading retained within USG export-filing databases. My review identified over 1100 export filings for AWE and SUBJECT that list the **SUBJECT PREMISES** since 2008. My review noted the last EEI filing was dated August 23, 2024. Further shipments post August 2024, reported as exported by AWE and SUBJECT under bills of lading, were discovered for the period between September 2024 and January 2025. Consignees for these post August 2024 export shipments by AWE and SUBJECT from the **SUBJECT PREMISES** were identified as JPKC INTR LTD ("JPKC") in Hong Kong and POLYNIC RESOURCES SDN BHD ("POLYNIC") in Malaysia.

22.     I am aware that in August 2024 Customs and Border Protection ("CBP") interdicted an AWE export shipment, sent via express courier, destined for JPKC in Hong Kong. An inspection of the microelectronics contained therein and the results of license determinations obtained from DOC-BIS revealed that several of the microelectronics were highly controlled CCL items, having ECCNs of 3A001. 15 C.F.R. Part 774, Supplement 1. CBP's inspection further found that AWE did not have a license to export said 3A001 microelectronics and their attempted export was in violation of U.S. law. Consequently, CBP seized this shipment from Air Wave.

Among the seized microelectronics were three types of 3A001 microelectronics: 20 RF gain block amplifiers, part no. AVA-26453LN-DG, five (5) RF amplifiers, part no. CMPA901A020S, and 20 high-electron-mobility transistors (HEMTs), part no. CGHV1F025S, manufactured by U.S. companies Mini Circuits and Macom Technology Solutions ("Macom"), respectively.  I am also aware that a commercial invoice that accompanied this interdicted shipment confirmed AWE at the **SUBJECT PREMISES** as the exporter, listed SUBJECT as the export contact at AWE, and listed "Sylvia Lee" as the Hong Kong consignee point of contact.

23.    I am further aware that subsequent to this illegal export shipment from AWE and SUBJECT, on October 25, 2024, DOC-BIS-OEE Special Agent Nicholas Crane met with SUBJECT about this seizure and AWE's business and export activities.  I have seen a law enforcement report prepared by Special Agent Crane concerning the details of his meeting with SUBJECT.  During that meeting, SUBJECT acknowledged that AWE was his company and that he was the only full-time employee.  SUBJECT also told Special Agent Crane that 90% of AWE's sales were exports.  SUBJECT denied that AWE purchased products that required a license to export.  SUBJECT averred to Special Agent Crane that the Hong Kong consignee for the seized microelectronics knows that AWE does not export products that require a license.

**B.    Investigation of AWE and SUBJECT related to the Illegal Export of TGA2963-CP power amplifiers**

24.    Despite that which he reported to Special Agent Crane, USG investigators discovered that, beginning in April 2025, SUBJECT and his company, AWE, engaged in negotiations for the purchase of an export-controlled microelectronic component manufactured by Qorvo Inc, a U.S. headquartered microelectronic manufacturer. The controlled component in question was identified as a power amplifier, part number TGA2963-CP.  Prior to SUBJECT's

and AWE's inquiries, in January 2025, pursuant to my request, DOC-BIS issued license determinations that classified the TGA2963-CP power amplifiers as CCL items having an ECCN of 3A001.b2b1.   In these determinations, DOC-BIS specifically declared export licenses were required for the export of the TGA2963-CP power amplifiers to China, Malaysia, or Russia.

25.     Specifically, USG investigators learned that, after initial email inquiries from a person named "Sylvia" using an AWE account, on May 16, 2025, SUBJECT sent an email from his AWE email account to Cooperating Company 1 asking to discuss the purchase price for a quantity of TGA2696-CP power amplifiers.   The digital signature line of SUBJECT's email listed AWE, identified AWE's address as the **SUBJECT PREMISES**, and included a telephone number and WhatsApp number of 914-471-7865.   I am aware that the results of a customs summons served on T-Mobile in June 2025 confirmed SUBJECT as the subscriber for the 914-471-7865 telephone number.   T-Mobile records further captured the subscriber address for the SUBJECT's account as the **SUBJECT PREMISES**.

26.     On May 22, 2025, after receiving a response from Cooperating Company 1 regarding the price quotation and an acceptable method of payment, SUBJECT wrote from his AWE email account that for payment he could only offer "HKI Escrow."   I am aware that "HKI Escrow," based on training and experience, refers to an escrow service used in commercial transactions where payments for commercial goods are made to, held by, and then released by a third-party escrow service upon completion of a seller's obligations.   I am further aware that "HKI Escrow" refers to a Hong Kong escrow service company.

27.     On May 30, 2025, SUBJECT emailed Cooperating Company 1 requesting to speak about the purchase of the TGA2963-CP via telephone.   On June 2, 2025, acting as an employee of Cooperating Company 1, I conducted an undercover, one-party consensually monitored telephone

call with SUBJECT at telephone number 914-471-7865.  SUBJECT answered the call and confirmed his identity and that of his company, AWE. During the phone call, SUBJECT expressed interest in purchasing all of the TGA2963-CP amplifiers that Cooperating Company 1 had available and even suggested that, after seeing photographs of the product, he was willing to fly to the location of Cooperating Company 1 and pay for the amplifiers in cash.  SUBJECT stated though he wanted to use an escrow company as protection against fraud.  When asked directly about the use of a Hong Kong escrow service for the sale of the amplifiers, SUBJECT stated the company offered the best rate.  During this phone call, I told SUBJECT that Cooperating Company 1 categorized the amplifiers as "restricted" and in response SUBJECT claimed the purchase was "domestic."

28.    On June 3, 2025, Cooperating Company 1 sent an email to SUBJECT introducing SUBJECT to an HSI undercover agent (UCA) who purported to work for a company that currently possessed the TGA2963-CP amplifiers that were available for purchase.  On June 9, 2025, the UCA conducted a one-party consensually monitored telephone call with SUBJECT in which the UCA and SUBJECT discussed the purchase of and payment for the TGA2963-CP amplifiers. During this conversation, the UCA asked SUBJECT about the end-user for the TGA2963-CP power amplifiers.  SUBJECT claimed his client for the amplifiers was a contract manufacturer on the west coast but did not provide other information.  During the call, the UCA informed SUBJECT that the TGA2963-CP power amplifiers are highly controlled and require licenses to export.  Also during his telephone call with the UCA, SUBJECT stated he was willing to drive $300,000 USD in cash, the total purchase cost of the power amplifiers, to the UCA in North Carolina.  During subsequent communication with SUBJECT, the UCA discussed meeting SUBJECT in Raleigh, NC.

29.    Based on my training and experience conducting export and counterproliferation investigations targeting transnational criminal organizations seeking to unlawfully acquire and divert U.S. export technology, as well as their domestic co-conspirators, a subject's willingness to travel to a vendor's location with large quantities of money, pay for export-controlled components in person, and hand-carry them away, is not consistent with legitimate practice and a red-flag indicator of an illegal export scheme.  Additionally, the suggested use of a foreign escrow service is another red-flag indicator signaling that the ultimate customer of an export-controlled or uncontrolled component is overseas, outside of the United States.

30.    On June 22, 2025, SUBJECT sent the UCA an email to which was attached an AWE purchase order for 250 TGA2963-CP power amplifiers for a total purchase price of $137,500 USD.  This purchase order, no. SYL0151, was dated June 23, 2025, and listed AWE as the recipient with SUBJECT as the receiving point of contact.  The **SUBJECT PREMISES** was listed on the purchase order as the address for AWE and SUBJECT.  SUBJECT's above-identified T-Mobile telephone number and his AWE email address were also listed on the purchase order.  A check of the metadata reported in the properties for this purchase order confirmed that SUBJECT was recorded as the author of the purchase order document.  In his email to the UCA, to which this purchase order was attached, SUBJECT asked the UCA for an address in Raleigh, NC where he could meet with the UCA to pay for and pick up the power amplifiers.

31.    Following additional contact and negotiation between SUBJECT and the UCA concerning the purchase of the TGA2963-CP power amplifiers, SUBJECT and the UCA discussed meeting in Raleigh, NC on August 27, 2025, to complete the transaction.  On August 26, 2025, however, SUBJECT notified the UCA that he was unable to make arrangements to pay for the components and the planned meeting for the following day was postponed.  Despite the

postponement, on August 27, 2025, SUBJECT sent the UCA an email with an attached, revised AWE purchase order for 100 TGA2963-CP power amplifiers with a purchase price of $55,00 USD. The purchase order number was again recorded as SYL0151. In his email, SUBJECT wrote to the UCA, among other things, asking for an address in Raleigh where the power amplifiers could be picked up. Communication between SUBJECT and the UCA continued into September 2025. The UCA attempted to arrange a meeting but SUBJECT stated he could not meet prior to planned international travel. I have conducted records queries in Customs databases related to SUBJECT's travel, and discovered that SUBJECT departed the United States on September 15, 2025. Additional travel reservation data reported in these databases related to SUBJECT's travel indicated SUBJECT was scheduled to return to the United States on November 10, 2025.

32.    On August 14, 2025, as email and telephone communication between the UCA and SUBJECT concerning the purchase of the TGA2963-CP power amplifiers was ongoing, the Honorable James E. Gates, U.S. Magistrate Judge for the Eastern District of North Carolina ("EDNC"), issued a search warrant for the contents of the AWE email accounts used by SUBJECT and the purported AWE representative, "Sylvia." I have reviewed the data furnished by the email host service provider pursuant to that search warrant, obtained in September 2025, and have identified evidence of diversion of controlled microelectronics, exported from the United States to destinations the export to which would require a DOC-BIS license, including China. Among the various communications concerning the illicit export and diversion of controlled microelectronics from the United States, I discovered an email, dated June 13, 2025, sent from "L Sylvia," using the email account "SYL6418@outlook.com," to SUBJECT at SUBJECT's AWE email account. In this email, "L Sylvia" directed SUBJECT to proceed with the order of the TGA2963-CP power amplifiers from the UCA. In her email, "L Sylvia" also wrote to SUBJECT the following:

13

> I am wondering if we can get a better price since there is no intermediate [sic] now.  Waiting for the updates regarding when we can get more quantity

The subject line of "L Sylvia's" email to SUBJECT was redacted as "Order#SYL0151 QORVO#TGA2963-CP QTY=550 Important! Urgent!"  Below this email was another email from May 13, 2025, sent by "L Sylvia" to SUBJECT at SUBJECT's AWE email account.  In that email, "L Sylvia" referenced purchase order number SYL0151 and provided information about Cooperating Company 1 and the TGA2963-CP power amplifiers.  In this email, "L Sylvia" wrote to SUBJECT to, "[p]lease accept the new order.  Thank you for your support!  Let me know if you have any problems when booking."  I noted that portions of the email header for this May 13, 2025, email were redacted in Chinese characters.  RA also found a notation in this email from "L Sylvia" for purchase order number SYL0151 that recorded SUBJECT as the buyer for the TGA2963-CP and that the parts would "ship via new company."

33.    During my review of the contents of the two AWE email accounts, I located a myriad of other messages evincing an illicit export and diversion conspiracy involving the SUBJECT, "Sylvia," and representatives of the Malaysian company, POLYNIC.  My review of these emails uncovered orders for export-controlled microelectronics submitted by "Sylvia" to SUBJECT and representatives of POLYNIC, including a representative using the name Ken Khor ("KHOR").  This email correspondence traffic between SUBJECT and POLYNIC representatives, including KHOR, revealed efforts to acquire export-controlled microelectronics from U.S. vendors to fill "Sylvia's" orders.  According to these emails, KHOR and POLYNIC purchased and attempted to purchase for export a variety of export-controlled and some uncontrolled microelectronic components from U.S. based online microelectronics distributors.  The email correspondence indicated that KHOR and POLYNIC attempted to do so when SUBJECT was

unable to acquire the export-controlled components through AWE. My review of the email exchanges between SUBJECT, "Sylvia," and KHOR, revealed that KHOR, in order to purchase and obtain controlled microelectronics from U.S. companies, falsely claimed the microelectronics were for POLYNIC in Malaysia, when actually destined to companies in China. In purchasing the restricted components, the email exchanges show that KHOR did not reveal that the microelectronics were for another end-user and once exported from the United States to Malaysia, would be diverted to Hong Kong or China. The email correspondence further showed that this illicit export procurement activity and conspiracy involving SUBJECT, AWE, KHOR, POLYNIC, and "Sylvia," is ongoing.

34.    Following the discovery of this export and diversion conspiracy involving SUBJECT, "Sylvia," KHOR, and others at POLYNIC, I reviewed electronic export information (EEI) filings from one of the U.S. based online microelectronics vendors ("U.S. Vendor 1") for which multiple invoices concerning the sale and export of 3A001 microelectronic components were found in SUBJECT's and "Sylvia's" emails with POLYNIC representatives. Those invoices identified KHOR and POLYNIC in Malaysia as the "Bill to" and "Ship to" party and listed the respective microelectronic components and part numbers that were purchased as well as their respective 3A001 ECCN designations. The invoices from U.S. Vendor 1 also contained the following destination control statement:

> These items are controlled by the U.S. Government and authorized for export only to the country of ultimate destination for use by the ultimate consignee or end-user(s) herein identified. They may not be resold, transferred, or otherwise disposed of, to any other country or to any person other than the authorized ultimate consignee or end-user(s), either in their original form or after being incorporated into other items, without first obtaining approval from the U.S. government or as otherwise authorized by U.S. aw and regulations. These commodities, technology or software are subject to the Export

Administration Regulations (EAR) and cannot be exported without proper license per EAR.

My review of EEI filings confirmed the export of multiple shipments of export-controlled 3A001 microelectronic components to POLYNIC in Malaysia from U.S. Vendor 1. In each EEI filing, U.S. Vendor 1 reported POLYNIC as the ultimate consignee and Malaysia as the country of ultimate destination. The EEIs did not identify other consignees or countries of ultimate destination beyond POLYNIC and Malaysia. In doing so, U.S. Vendor 1 claimed an export license exception applicable to Malaysia but unavailable for Hong Kong or China.[7]

35. As further evidence of this illicit export conspiracy to knowingly and unlawfully divert U.S. origin export-controlled microelectronics to Hong Kong and China via Malaysia, I have seen email communications between SUBJECT, KHOR and other POLYNIC representatives, and "Sylvia" concerning the diversion of another microelectronic manufactured by Qorvo identified as an RF amplifier, part number TGA2624-SM. Open-source research of the Qorvo website has confirmed the TGA2624-SM RF amplifier, like the TGA2963-CP power amplifier, is export-controlled under ECCN 3A001. Specifically, these communications involved a June 22, 2025, email from SUBJECT to multiple POLYNIC recipients and "Sylvia" with the subject line "AIRWAVE PO#SYL0141 TGA2624-SM, SHIPPING ADVICE." In that email, SUBJECT provided instructions to POLYNIC that the company, prior to shipping the TGA2624-

---

[7] Based on my review of the email correspondence between SUBJECT, "Sylvia," and POLYNIC representatives, specifically KHOR, as well as the EEI filings for export shipments to POLYNIC from U.S. Vendor 1 under the listed license exception, I believe that U.S. Vendor 1 claimed the existence of the license exception based on the knowingly false information provided by KHOR and POLYNIC concerning the ultimate use and end-destination of the otherwise export-controlled 3A001 microelectronics. Consequently, SUBJECT and his co-conspirators, "Sylvia," KHOR, and other POLYNIC representatives engaged not only in an export conspiracy but a conspiracy to commit wire fraud as well contrary to Title 13 U.S.C. § 1343.

SM components onward, should remove all labels, declare the components as ECCN EAR99 and undervalue the shipment.  In doing so, SUBJECT provided a FedEx account number and an address in Hong Kong to where the TGA2624-SM were to be shipped.  Following SUBJECT's email, a POLYNIC representative, using a POLYNIC email account, responded to SUBJECT, acknowledged SUBJECT's directives, and provided a tracking number for the shipment.  On June 25, 2025, SUBJECT forwarded the email chain with his message and the POLYNIC representative's response and tracking number to "L Sylvia" at her email account, "SYL6418@outlook.com."

36.     Another example of this conspiracy involving SUBJECT and attempts to illegally acquire U.S. controlled technology for export was found in email correspondence between SUBJECT, "Sylvia," and KHOR in March 2025.  Specifically, I located an email string beginning in February 2025 in which SUBJECT directed KHOR to purchase a microelectronic manufactured by MACOM, part number CGHV1F025S, from another large U.S. online microelectronics distributor ("U.S. Vendor 2").  In doing so, SUBJECT asked KHOR to provide confirmation and a tracking number when the part was shipped by U.S. Vendor 2.  SUBJECT's email referenced "AIRWAVE PO#SYL0118."  Open-source queries of this component on microelectronic distributors websites identified the CGHV1F025 as a high-electron-mobility transistor export controlled under ECCN 3A001.  A second email, sent in March 2025, by KHOR in response to SUBJECT's directive to purchase the MACOM CGHV1F025S component, advised SUBJECT that U.S. Vendor 2 had cancelled the order due to issues related to "Export License."  After receiving this email, SUBJECT forwarded KHOR's email to two email accounts associated with "Sylvia."  One account was the aforementioned "syl6418@outlook.com" account and the other was a "sylvia@tuuk.uk" email account.  After receiving the forwarded email, "Sylvia" responded

to SUBJECT, "Can u book then?" I am aware from training and experience that illicit proliferation networks will attempt multiple means to illegally acquire, export, and divert U.S. origin components. This includes attempts to disguise the fact from manufacturers, distributors, and other vendors that purchased controlled components are for unlicensed export by using domestic proxies to complete the purchase. I believe that "Sylvia's" message to SUBJECT evinces such a modus operandi.

37.    In reviewing the content of the SUBJECT's and "Sylvia's" AWE email accounts, I discovered further evidence of the conspiracy between SUBJECT and "Sylvia" to illegally divert controlled microelectronics from the United States to China. Specifically, I discovered an AWE "Commercial/Tax Invoice" dated March 13, 2025. The invoice listed the **SUBJECT PREMISES** as AWE's address and included SUBJECT's T-Mobile telephone number. The invoice itself referenced the sale of 10 microelectronic components, part number MMA-005022-M4, from AWE to overseas companies, believed to associated with "Sylvia" and unknown associates and customers of hers. Queries of this component on microelectronic distributor websites identified the MMA-05022-M4 component as an RF monolithic microwave integrated circuit traveling wave amplifier that is export-controlled with an ECCN of 3A0001. My review of the invoice identified the "bill to" party as TUUK INTL LIMITED "TUUK" with an address in London, England. The "ship to" party, however, was identified as:

Shenzhen Dianji Tech Limited/Diao Sheng
Rm 2609 Build B, Jiahe Huaqiang Building
Zhonghang Rd, Futian Disttrict, Shenzhen
Guangdong Province, 518031 China
Tel # 86 1509936262

This invoice also referenced purchase order number SYL0123, identified the shipment of the components to the above China-based consignee was via FedEx from "MY," which I know to be

the country code for Malaysia, and listed a shipping date of March 20, 2025. Based on my training and experience as well as that which I have uncovered during this investigation, I have reason to believe that this invoice is evidence of the illegal proliferation conspiracy between SUBJECT, via AWE, "Sylvia," and Malaysian representatives of POLYNIC to unlawfully cause the export and unlicensed diversion of controlled microelectronics to China.

38.    Additionally, my review of AWE email content yielded other correspondence of note between KHOR and SUBJECT.  This correspondence occurred in November 2024 and pertained to KHOR's attempt to purchase a component direct from a U.S. headquartered microelectronic manufacturer ("Manufacturer 1") via the manufacturer's direct online purchasing portal.  In the correspondence, the component sought by KHOR was not fully identified but rather was identified as an "Aerospace and Defense part."  In this correspondence with representatives from Manufacturer 1, after being required to provide more information about POLYNIC as well as end-use and end-customer information for the part, KHOR sent an email to Manufacturer 1 representatives identifying POLYNIC as a "contract manufacturer in Plastic Injection Molding and Wire Harnesses."  KHOR further claimed that the component was for an "American corporation in Malaysia in R&D stage" but "[d]ue to the sensitivity of the product," KHOR averred he could not disclose details because of a signed "NDA."[8]  After receiving acknowledgement from representatives of Manufacturer 1 and an explanation regarding the need for Manufacturer 1 to gather information about POLYNIC as well as the ultimate customer and end-use of the component in question, KHOR forwarded the entire email string to SUBJECT.  In doing so, KHOR wrote to SUBJECT at SUBJECT's AWE email account the following message, in pertinent part:

---

[8] I am aware that the acronym "NDA" stands for Non-Disclosure Agreement.

> FYI…Below is the latest information I received from [Manufacturer 1]. If the part we enquired [sic] is meant for Aerospace & Defence use, is better we don't get into the game as we both know where [sic] those parts will be ending up with. Shall keep you posted on the progression….

I believe this email demonstrates not only SUBJECT's and his company's, AWE, involvement in an illegal export conspiracy but that the conspiracy involves the knowing illegal diversion of export-controlled microelectronics to end-users and for end-users SUBJECT and his co-conspirators know to be prohibited without appropriate authorization from the U.S. Government. Moreover, this correspondence demonstrates SUBJECT's continued participation in the export conspiracy and his efforts to illegally obtain, export, and divert controlled microelectronics from the United States in violation of, inter alia, the EAR and ECRA. Moreover, this correspondence shows that SUBJECT continued to engage in this illegal activity following the above-delineated August 2024 seizure of an illegal AWE export shipment and SUBJECT's October 2024 meeting with DOC-BIS-OEE Special Agent Crane.

39.     The only individual believed to be living with SUBJECT at **SUBJECT PREMISES** is his wife, Hui Chin. Investigation has uncovered that his wife also maintains an email account with AWE and that she has used that email account in furtherance of re-exporting U.S. origin microelectronics to Hong Kong. In March 2025, SUBJECT advised POLYNIC employees to take picture of shipments, remove labels from the packaging containing integrated circuits, under value the items by declaring values of $5 and $10 per unit, and then ship them to an address in Hong Kong. When the POLYNIC employees alerted SUBJECT that they had not received the purchase orders they had been expecting, SUBJECT's wife directed them to continue to ship the orders, even if the purchase orders do not match, as long as the quantities are correct.

40.     Based on the foregoing, I have reason to believe that SUBJECT, by and through his company, AWE, and operating out of the **SUBJECT PREMISES** is actively engaged in the knowing illegal export, smuggling, and diversion of export-controlled microelectronics without required U.S. Government authorization and conspiracy to illegally export, smuggle and divert the same in violation of various U.S. laws.

41.     In my experience in working export control cases and discussing such cases with other law enforcement agents, I am familiar with the fact that individuals and companies involved in the export business, and particularly those with questionable export practices, maintain records, both printed and in electronic form; keep electronic devices used in communication and documentation related to their business; and keep packaging materials and items to be exported, at the locations used for conducting any aspect of the business.  In this instance, the evidence gathered in probable cause for me to believe that such items which are contraband, evidence, instrumentalities, and fruits of the violations at issue in this investigation will be found stored at the **SUBJECT PREMISES**.

### D.     <u>Computers, Electronic Storage, and Forensic Analysis</u>

42.     As described above and in Attachment B, this application seeks permission to search for records that might be found on **SUBJECT PREMISES** in whatever form they are found.  One form in which the records might be found is data stored on a computer's hard drive or other storage media, including cellphones.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

43. *Probable cause.* I submit that if a computer or storage medium is found on the **SUBJECT PREMISES**, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

    a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

    b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

    c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users

typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

    d.   Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

44.    *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the **SUBJECT PREMISES** because:

    a.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, email programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.  As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, information stored within a computer or storage media (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti-virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage media.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner.  Further, computer and storage media activity can indicate how and when the computer or storage media was accessed or used.  For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet.  Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation.  Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect.

24

For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

c.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer

25

and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

45.    *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a premises for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine

storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on the Premises. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

46.    *Nature of examination.*   Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

### E.    <u>Unlocking Devices</u>

47.   The warrant I am applying for would permit law enforcement to obtain from certain individuals the display of physical biometric characteristics (such as fingerprint, thumbprint, or facial characteristics) in order to unlock devices subject to search and seizure pursuant to this warrant. I seek this authority based on the following:

    a.   I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

    b.   If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

c.  If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID."  During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

d.  In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

e.  As discussed in this affidavit, based on my training and experience I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

f.  I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers,

29

that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours *and* the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

g.  In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device. However, in my training and experience, that person may not be the only user of the device whose physical characteristics are among those that will unlock the device via biometric features, and it is also possible that the person in whose possession the device is found is not actually a user of that device at all. Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device. Thus, it will likely be necessary for law enforcement to have the ability to require any individual, who is found at the **SUBJECT PREMISES** and reasonably believed by law enforcement to be a user of the device,

to unlock the device using biometric features in the same manner as discussed above.

h. Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of any individual, who is found at the **SUBJECT PREMISES** and reasonably believed by law enforcement to be a user of the device, to the fingerprint scanner of the device; (2) hold the device in front of the face of those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

### III.     CONCLUSION

47.     I submit that, based on the aforementioned information, as well as my training and experience, there is probable cause to believe that the **SUBJECT PREMISES** may contain evidence of smuggling goods from the United States, in violation of the Export Control Reform Act, 50 U.S.C. §4819 (a)(2)(D), smuggling goods from the United States, in violation of 18 U.S.C. §554, and wire fraud, in violation of 18 U.S.C. §1343, in addition to fruits and instrumentalities of the aforementioned violations. Therefore, I respectfully request that this Court authorize a search warrant for the **SUBJECT PREMISES**, as described in Attachment A, authorizing the seizure of the items described in Attachment B.

Respectfully submitted,

AARON W BODE

Digitally signed by AARON W BODE
Date: 2025.11.21 17:29:14 -05'00'

Aaron Bode, Special Agent
Homeland Security Investigations

Attested to in accordance with the
requirements of Fed. R. Crim. P. 4.1
via telephone on November 24, 2025.

*William E. Fitzpatrick*

The Honorable William E. Fitzpatrick
United States Magistrate Judge
Alexandria, Virginia

## <u>ATTACHMENT A</u>

### DESCRIPTION OF PREMISES

The property to be searched is a single-family residential dwelling located at 7219 Deavers Run Court, Springfield, VA 22152, which is further described as a two-story structure, with a brick frontal façade, a dark shingle roof, with white trim and black faux shudders adjacent to several exterior windows along the front of the house.  The house sits in a cul-de-sac and has a black-in-color front door and an attached garage with two white-in-color single vehicle garage doors.  A driveway leads from the attached garage to the roadway at Deavers Run Court.  A black-in-color mail box sits atop a white-in-color post next to the driveway along Deavers Run Court and bears the numbers "7219."

The premises to be searched includes any garages, sheds, storage rooms, storage lockers, and any outbuildings located thereon or associated therewith. Also to be searched are any vehicles and computers located at the premises.

Images of the premises to be searched are below:







## ATTACHMENT B

### DESCRIPTION OF ITEMS TO BE SEIZED

1.     All contents within the **SUBJECT PREMISES** described in Attachment A that relate to violations of 50 U.S.C. § 4819(a)(2)(D) (conspiracy to violate the Export Control Reform Act) and 18 U.S.C. §§ 554 (smuggling goods from the United States) and 1343 (wire fraud) (the "Target Offenses"), including:

 a.  All fruits, contraband, evidence, and instrumentalities of the Target Offenses;

 b.  Any and all data and documents relating to the purchase, sale, import, export, shipment, transshipment, diversion, manufacture, or acquisition of U.S. commodities or technical drawings, including but not limited to, requests for offers, requests for quotations, requests for bid, solicitations for offers, quotations, bids, proposals, estimates, contracts, purchase requests, purchase orders, ordering agreements, delivery orders, invoices, and sales agreements relating to and involving Kok Keong Ang ("SUBJECT"), AIR WAVE ELECTRONICS, INC ("AWE"), AWE's agents, employees, officers, representatives, designees or associates, and/or co-conspirators;

 c.  Any and all data and documents relating to the costs associated with, and payment for, the purchase, sale, import, export, manufacture, or acquisition of commodities or technical drawings including, but not limited to, accounts payable journals or ledgers, accounts receivable journals or ledgers, requests for payment, invoices, claims or any other billing documents, cancelled checks, bank drafts, records of wire transfers or other financial instruments or records reflecting payment relating

to and involving SUBJECT, AWE, its agents, employees, officers, representatives, designees or associates, and/or co-conspirators;

d.  Any and all data and documents related to shipment, import, and/or export documentation, including but not limited to shipping documents, packing slips, shipping labels, certifications, invoices, quotes, letters of credit, telexes, facsimiles, electronic mail, shipping vouchers, memoranda, notes, contracts, bills of lading, airway bills, U.S. Department of Commerce and/or U.S. Department of State forms, Shipper's Letter of Instruction, Shipper Export Declarations, End User Forms, packing instructions, technical specifications and any other correspondence relating to the purchase, sale, servicing or repair of commodities or other parts or components, relating to and involving SUBJECT, AWE, its agents, employees, officers, representatives, designees or associates. and/or co-conspirators;

e.  Any and all data, documents and records of communication pertaining to the purchase, sale, manufacture, servicing or repair of commodities, technical drawings, parts or components, including, but not limited to, meeting notes, emails, phone records, recordings, correspondence, notes, letters, memoranda or other documents reflecting communication, relating to and involving SUBJECT, AWE, its agents, employees, officers, representatives, designees or associates, and/or co-conspirators;

f.  Any and all data, documents and records of individuals, agents, nominees and representatives acting on behalf of SUBJECT, AWE, its agents, employees, officers, representatives, designees or associates, and/or co-conspirators relating to

36

the shipment, smuggling, export, transshipment, diversion or import of commodities;

g. Any and all data, documents, records or address books that reflect contact and communication among and/or between and involving SUBJECT, AWE, its agents, employees, officers, representatives, designees or associates, and/or co-conspirators, including any aliases, nominees, representatives and/or agents thereof, including the names, addresses, and/or telephone numbers of individuals, businesses and/or associates pertaining to the purchase, sale, servicing or repair of commodities;

h. Any and all data and records indicating travel of any officers and/or employees, relating to meetings and or liaisons with SUBJECT, AWE, its agents, employees, officers, representatives, designees or associates, co-conspirators and/or any of its agents, aliases, nominees, representatives, employees;

i. Any and all records and data pertaining to facilitators, co-conspirators, aiders and abettors, consultants and/or agents acting in concert with or on behalf of SUBJECT, AWE, its agents, employees, officers, representatives, designees or associates. and/or co-conspirators related to the purchase, sale, export, import, servicing or repair of commodities including, but not limited to, consultant agreements and commission statements, and/or communications;

j. Any and all data and documents relating to the disposition and/or movement of funds related to the export of commodities and components by and involving SUBJECT, AWE, its agents, employees, officers, representatives, designees, associates, and/or co-conspirators, or any of their representatives, officers or

employees, including, but not limited to, wire transfers, bank transfers, cash transactions, electronic transfers and credit arrangements;

k.  Any and all data, records or documents indicating SUBJECT's, AWE's, or its agents, employees, officers, representatives, designees or associates, and/or co-conspirators, or its nominees, agents, representatives or employees, knowledge of U.S. export compliance regulations and/or its intent to circumvent any U.S. export compliance and/or shipping regulations; and

l.  Any and all data and documents reflecting expenses associated with travel between the United States and a foreign destination including, but not limited to, airline tickets, lodging receipts, meal receipts, incidental expense receipts, credit card statements, credit card payments, invoices, and records associated with travel expense reimbursements.

2.  For any computer or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a.  evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.  evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence

38

of the presence or absence of security software designed to detect malicious software;

c.  evidence of the lack of such malicious software;

d.  evidence indicating how and when the COMPUTER was accessed or used to determine the chronological context of COMPUTER access, use, and events relating to crime under investigation and to the COMPUTER user;

e.  evidence indicating the COMPUTER user's state of mind as it relates to the crime under investigation;

f.  evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

g.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

h.  evidence of the times the COMPUTER was used;

i.  passwords, encryption keys, and other access devices that may be necessary to access the COMPUTER;

j.  documentation and manuals that may be necessary to access the COMPUTER or to conduct a forensic examination of the COMPUTER;

k.  records of or information about Internet Protocol addresses used by the COMPUTER;

l.  records of or information about the COMPUTER's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

m. contextual information necessary to understand the evidence described in this attachment.

As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

The term "COMPUTER" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, smartphones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

During the execution of the search of the SUBJECT PREMISES described in Attachment A, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of any individual, who is found at SUBJECT PREMISES and reasonably believed by law enforcement to be a user of a device found at SUBJECT PREMISES, to the fingerprint scanner of the device; (2) hold a device found at SUBJECT PREMISES front of the face those same individuals and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.